Marcia Fuller Durkin (09973)
8798 S. Sutton Way
Cottonwood Heights, Utah  84121
(801) 635-7804
marcia.durkin@gmail.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J WHITE, L.C., a Utah limited liability company; WWIG LLC, a Utah limited liability company; and WW-ARIS LLC, a Utah limited liability company.<br><br>        Plaintiffs,<br><br>        v.<br><br>GREGORY WISEMAN, an individual; GWSVR, LLC, a Wyoming limited liability company; APARTMENT MANAGEMENT CONSULTANTS, a Utah limited liability company; RENTERS LEGAL LIABILITY LLC, a Utah limited liability company; RENTERS LEGAL LIABILITY RISK PURCHASING GROUP, INC., an Illinois corporation; DOE INDIVIDUALS, I THROUGH CCL; ROE CORPORATIONS, I THROUGH CCL; and POE CORPORATIONS, I THROUGH L.<br><br>        Defendants. | **COMPLAINT**<br><br>**And**<br><br>**JURY DEMAND**<br><br>Case No.:<br><br>Judge: |

## <u>COMPLAINT</u>

Plaintiffs J WHITE, L.C., WWIG LLC, and WW-ARIS LLC (collectively "Plaintiffs") complain against Defendants GREGORY WISEMAN, APARTMENT MANAGEMENT CONSULTANTS, LLC, RENTERS LEGAL LIABLITY LLC, RENTERS LEGAL LIABILITY RISK PURCHASE GROUP, INC, DOE INDIVIDUALS I through CCL, ROE

CORPORATIONS I through CCL, and POE CORPORATIONS I through L (collectively "Defendants") and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.   J WHITE, L.C. is a Utah limited liability company with its principal place of business at 7387 Claret Circle, Cottonwood Heights, Utah  84121.

2.   WWIG, LLC is a Utah limited liability company with its principal place of business at 7001 South 900 East, Suite #460, Midvale, Utah 84047.

3.   WW-ARIS, LLC is a Utah limited liability company with its principal place of business at 7001 South 900 East, Suite #460, Midvale, Utah 84047.

4.   Plaintiffs are informed and believe and therefore allege that Defendant GREGORY WISEMAN ("WISEMAN") is an adult individual residing in the city of Sandy, County of Salt Lake, in the State of Utah.

5.   Plaintiffs are informed and believe and therefore allege that Defendant GWSVR, LLC is a Wyoming limited liability company with its principal place of business at 1621 Central Ave., Cheyenne, Wyoming 82001.

6.   Plaintiffs are informed and believe and therefore allege that Defendant APARTMENT MANAGEMENT CONSULTANTS, LLC ("AMC") is a Utah limited liability company with its principal place of business at 1954 E. Fort Union Blvd., Suite #500, Cottonwood Heights, Utah 84121.

7.   Plaintiffs are informed and believe and therefore allege that Defendant RENTERS LEGAL LIABILITY LLC is a Utah limited liability company with its principal place of business at 60 South 600 East, Suite #100, Salt Lake City, Utah, 84102.

8.   Plaintiffs are informed and believe and therefore allege that Defendant RENTERS LEGAL LIABILITY RISK PURCHASING GROUP, INC. ("RLLRPG") is an Illinois Corporation with its principal place of business at One North Franklin Street, Suite #3600, Chicago, Illinois 60606.

9.   Plaintiffs are informed and believe and therefore allege that at all times material hereto, Defendants DOES I through CCL were individuals.  The identities of DOES I through CCL are currently unknown and when ascertained, Plaintiffs will seek leave of this Court to file an Amended Complaint.  Plaintiffs believe that each Defendant named as a DOE is responsible in some manner for the acts and/or omissions alleged herein.

10. Plaintiffs are informed and believe and therefore allege that at all times material hereto, Defendants ROE CORPORATIONS I through CCL were corporations, limited liability companies, partnerships, or other business entities utilized by the Defendants herein in connection with their activities set forth in this Complaint and/or utilized by the Defendants.  The identities of the ROE Corporations I through CCL are currently unknown and when ascertained, Plaintiffs will seek leave of this Court to file an Amended Complaint. Plaintiffs believe that each Defendant named as a ROE CORPORATION is responsible in some manner for the acts and/or omissions alleged herein.

11. Plaintiffs are informed and believe that therefore allege that at all times material hereto, Defendants POE CORPORATIONS I through L were corporations, limited liability companies, partnerships, or other business entities utilized by the Defendants herein in connection with their activities set forth in this Complaint and/or utilized by the Defendants.  The identities of the POE Corporations I through L are currently unknown

and when ascertained, Plaintiffs will seek leave of this Court to file an Amended Complaint.  Plaintiffs believe that each Defendant named as a POE CORPORATION is responsible in some manner for the acts and/or omissions alleged herein.

## JURISDICTION AND VENUE

12. Plaintiffs re-allege and incorporate by reference each of the allegations set forth in Paragraphs 1 through 11 of this Complaint and further allege as follows:

13. This is a civil action for breach of contract, breach of fiduciary duty, tortious interference with contractual relations, tortious interference with prospective economic relations, civil conspiracy, and RICO.

14. This Court has jurisdiction pursuant to 18 U.S.C. §§ 1964 (C) and 1965.

15. This Court may assert supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims asserted here as such claims are so related to those over which this Court has original jurisdiction as to form part of the same case or controversy.

16. This Court has jurisdiction over Defendants under Utah Code Ann. §78-27-24.

17. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims here occurred in this judicial district.

## FACTUAL ALLEGATIONS

18. Plaintiffs re-allege and incorporate by reference each of the allegations set forth in Paragraphs 1 through 17 of this Complaint and further allege as follows:

19. Defendants DOES and ROE CORPORATIONS (collectively referred to throughout the Complaint as "PROPERTY OWNERS") were the owners of residential

rental properties who retained Defendant AMC to manage the day-to-day operations of their residential rental properties.

20. Defendant AMC is a property management company engaged by the PROPERTY OWNERS to manage residential rental properties owned by certain of the PROPERTY OWNERS, to be identified in an Amended Complaint.  Upon information and belief, Defendant AMC managed at least 62,275 different residential rental units by November 2012.

21. Upon information and belief, WISEMAN and/or GWSVR, LLC ("collectively referred to as "WISEMAN"), is the Managing Partner of AMC.

22. PROPERTY OWNERS are owners of various residential rental properties that utilize Defendant AMC to manage the day-to-day operations of the apartments which the PROPERTY OWNERS own.  Collectively, the various Defendant PROPERTY OWNERS own residential rental properties located in Utah, Arizona, Hawaii, Maryland, Ohio, Virginia, California, Idaho, Montana, Oregon, Washington, Illinois, Texas, Wyoming, Florida, Kansas, and Nevada.

23. In or about 2009 Defendant PROPERTY OWNERS chose to begin requiring that the tenants residing in their residential rental properties have a minimum of $100,000 of renter's liability insurance.

24. Upon information and belief, AMC recommended to the Defendant PROPERTY OWNERS, that their tenant leasing contracts be altered so that the contracts required that prospective tenants provide proof of at least $100,000 of renter's insurance.

25. Defendant WISEMAN approached Jeff White regarding creating an insurance company with the sole purpose of providing renter's insurance to tenants living in AMC managed properties.

26. As the WISEMAN and Jeff White contemplated how best provide the tenants of AMC managed properties with sufficient insurance, they commissioned an insurance feasibility study.  This feasibility study was required by the Utah Insurance Department before a certificate of authority for an insurance company could be granted.  At the time of the feasibility study, the precise corporate structure of the insurance company, the captive insurance and the holding company were still unclear so WISEMAN commissioned the study through AMC.  As a result of the feasibility study, WISEMAN and Jeff White formed WWIG.

27. The feasibility study provided projections regarding the total number of units and revenues AMC anticipated an insurance company selling renters insurance to AMC tenants would be able to provide during the next 5 years. In those projections, it was estimated that by the 5th Year of selling renter's insurance, the insurance company servicing AMC residential rental properties would be providing insurance policies to 66,164 units.  It was further projected that by Year 5, the insurance company would be realizing profits in excess of $10.8 million.  All of these projections were filed with the Utah Insurance Department.

28. On or about October 20, 2009, Defendant WISEMAN and Jeff White formed WWIG LLC ("WWIG"), an insurance agency whose sole purpose was to offer renter's insurance for tenants residing in apartments managed by AMC and all AMC affiliated companies.

29. On or about October 20, 2009, ARIS was formed as a single parent pure captive of AMC with both Defendant WISEMAN and Jeff White as principals in the company.

30. On or about February 18, 2010, WW-ARIS was formed with both Defendant WISEMAN and Jeff White as principals in the company.  WW-ARIS was the holding company of WWIG.

31. On or about November 11, 2009 WWIG was granted a license from the Utah Insurance Department to sell renters insurance to tenant residing in AMC managed residential rental properties in Utah.

32. Between March 2010 and February 2012 WWIG was granted licenses by the governing insurance bodies in Washington, Colorado, Wyoming, Florida, Georgia, Illinois, Ohio, Texas, Arizona, California, and Nevada to sell renters insurance to tenants residing in AMC managed residential rental properties in those states.

33. AMC and WWIG created a group master policy wherein any tenant residing in a participating AMC managed residential rental property would be automatically qualified to purchase personal liability insurance coverage as well as personal property protection from WWIG.

34. On or about February 1, 2010, WWIG began entering into agreements with certain of the PROPERTY OWNERS permitting WWIG to market its renters' insurance policies to tenants residing in residential rental properties managed by AMC (the "Marketing Agreements").

35. Under the terms of the Marketing Agreements, WWIG was given the right to market and sell renters insurance policies to tenants living in AMC managed residential

rental properties and AMC would collect the insurance premiums as part of the rent collection process and provide those premiums to WWIG.

36. The collection of the insurance premiums with the tenant's rent, known as the Pay-With-Rent option, was crucial to the WWIG insurance program.

37. The Marketing Agreement provided that WWIG would offer tenants residing in AMC managed properties the opportunity to purchase $100,000 worth of rental insurance, thus helping the PROPERTY OWNERS ensure that tenants residing in their respective residential rental properties were maintaining a minimum of $100,000.00 of liability insurance.

38. On or about June 1, 2010, WWIG began selling renters' insurance to tenants at residential rental properties managed by AMC which had agreed to participate in the WWIG pay-with-rent program.

39. WWIG offered the tenants at AMC managed residential rental properties two options for renter's insurance.  The first option provided $100,000 worth of personal liability coverage with a $0 deductible along with $10,000 of personal property protection for $16.00 per month.  A second option was offered at $10.75 per month and provided $100,000 worth of personal liability coverage with a $0 deductible.

40. On or about March 15, 2011, WISEMAN sold his interests in WWIG back to WWIG.

41. On or about March 15, 2011, WISEMAN sold his interest in WW-ARIS back to WW-ARIS.

42. After the sale of his interests in WWIG, WISEMAN remained a member/manager of WWIG until August 2011.

43. After the sale of his interests in WW-ARIS, WISEMAN remained a member of the board of directors of ARIS December 27, 2012 and a member/manager of WW-ARIS until March 2013.

44. Between approximately June 1, 2010 and November 30, 2012, WWIG entered into rental insurance contracts with approximately 29,601 tenants.  The term of these rental insurance contracts mirrored the term of the lease with an option to renew at the end of each lease term.

45. By November 30, 2012, WWIG was collecting more than $216,500 each month in rental insurance premiums from tenants residing in AMC managed residential rental properties.

46. By November 30, 2012, WWIG was offering renter's insurance policies to tenants at more than 140 different residential rental properties managed by AMC, thus providing WWIG access to more than 30,250 different rental units.

47. By November 30, 2012, WWIG was working with the various PROPERTY OWNERS at 41 more AMC managed properties, with more than 13,022 units.   WWIG was prepared to start offering renter's insurance policies to all tenants in those properties.

48. Between May 2012 and December 2012, WISEMAN – as an agent for the PROPERTY OWNERS – began a series of conversations with Jeff White looking for different approaches to selling renter's insurance to tenants of AMC managed residential rental properties.

49. On or about July 26, 2012, WISEMAN proposed that WWIG offer to give certain portions of the monthly premiums of the renters' insurance policies to the PROPERTY

OWNERS as a means to guarantee that the automatic renewal provisions of the Marketing Agreements would in-fact renew.

50. Between July 26, 2012 and March 2013, WWIG and WW-ARIS worked with various regulators in an attempt to develop new captive programs that would satisfy WISEMAN's July 26, 2012 request.  However, none of the approaches WWIG and WW-ARIS considered were both economically feasible and able to satisfy the requirements of the Utah Insurance Code.

51. When Jeff White informed WISEMAN that he had been unable to find an economically feasible approach to satisfy his July 26, 2012 request, WISEMAN informed Jeff White that he had found another insurance company, later determined to be RLL, who was able to offer a kickback to each of the PROPERTY OWNERS.

52. Sometime in December 2012, WISEMAN informed Jeff White that Defendants Renters Legal Liability LLC had proposed to replace WWIG as the provider of the renter's insurance group master policy for AMC and they would, in exchange, provide the PROPERTY OWNERS with a kickback representing a portion of the monthly premiums AMC would collect from the tenants of the AMC managed residential rental properties.

53. Defendant Renters Legal Liability is registered as an insurance agency with the Utah Insurance Department.

54. Upon information and belief, RLLRPG is a risk purchasing group(s) ("RPG") under the federal Liability Risk Retention Act ("LRRA"), 15 U.S.C. § 3901, formed on or about April 2013.   Renters Legal Liability and RLLRGP are collectively referred to as ("RLL").

10

55. The LRRA is Federal legislation passed in 1986 that authorized the formation of purchasing groups and group self-insurance programs for certain types of liability exposures. A Risk Purchasing Group is only allowed to join together to purchase liability insurance.

56. Defendant POE CORPORATIONS are insurance underwriters who worked with Defendant RLL to provide the underlying Master Group Policy coverage for the policies RLL marketed to the tenants residing in AMC managed residential rental properties.

57. On or about December 2, 2012 AMC sent notice to WWIG indicating that as "agent" for the PROPERTY OWNERS, he was informing WWIG that 41 of the AMC properties owned by the PROPERTY OWNERS were terminating the Marketing Agreements and no longer intended to honor the terms of those Marketing Agreements.

58. In December 2012, AMC sent letters to each of the AMC tenant's residing in the 41 residential rental properties who terminated their Marketing Agreements.  The letter indicated that any tenant with renter's insurance through WWIG's Pay-With-Rent program would, effective February 28, 2013, no longer be able to pay their renters insurance premiums through AMC's Pay-With-Rent program.    AMC instead indicated that a pay-with-rent liability insurance replacement product would be offered on behalf of RLL starting March 1, 2013.  AMC represented to all tenants that the RLL policy was a liability only master policy that was replacing WWIG's renter's policies.

59. Despite the December 2012 letter to selected tenants and emails to WWIG regarding termination of select Marketing Agreements, between December 2012 and March 2013, WISEMAN offered on numerous occasions to continue using WWIG if it could provide the kickbacks that RLL was offering to the PROPERTY OWNERS.  On

each such occasion, WWIG indicated that under the Utah Insurance Code it was impermissible to provide a kickback to the PROPERTY OWNERS and refused to enter into an arrangement where WWIG was violating the Utah Insurance Code.

60. Upon information and belief, RLL, AMC, and the PROPERTY OWNERS jointly agreed that RLL would obtain a master group policy from one or more of the POES that would cost approximately $7.00 per month per tenant and had a $250.00 deductible for each claim.

61. However, RLL, AMC, and the PROPERTY OWNERS agreed that RLL would offer renter's insurance policies to tenants of AMC managed residential rental properties for $10.00 per month.

62. Based on the difference between the actual cost of the policies and the costs charged to the tenants, RLL agreed to provide Defendant PROPERTY OWNERS with a kickback of approximately $3.00 a month on each renter's insurance policy RLL entered into with tenants of AMC managed residential rental properties.

63. Upon information and belief, each one of the POES providing the underlying insurance coverage for the group master policies RLL was providing to the PROPERTY OWNERS, knew or should have known of the kickbacks RLL was providing the PROPERTY OWNERS.

64. The tenants of the AMC managed residential rental properties purchasing renter's insurance from RLL were never informed that they were receiving approximately $7.00 worth of insurance but paying $10.00 for this renter's insurance, nor was it disclosed to the tenants that approximately $3.00 of the cost of their renter's insurance was going directly to the PROPERTY OWNERS, in clear violation of Utah Code Ann. §§ 31-A-

23a-402.5, 31A-23a-504, and 76-6-521, as well as similar statutes in other states in which
this illegal scheme was being conducted.

65. Defendant AMC and the PROPERTY OWNERS did in fact stop collecting the
WWIG insurance premiums as part of the Pay-With-Rent program promised to the
tenants who had rental insurance policies through WWIG by the end of September 2013.

66. Upon information and belief, between December 2012 and October 2014, all
communications to AMC tenants regarding the RLL pay-with-rent program from AMC,
the PROPERTY OWNERS, and RLL clearly indicated that the tenants were paying for a
liability only renter's insurance policy provided by RLL.

67. The Defendants, recognizing the illegality of the kickback arrangement RLL was
engaged in with the PROPERTY OWNERS, tried to cover their tracks in multiple ways,
including but not limited to, altering the language used to describe the coverage the
tenants were purchasing through RLL, in direct contradiction to earlier correspondence
with the tenants and the terms of the lease agreements.

68. Beginning in or about October 2014, AMC began claiming that rather than the
tenants purchasing renter's liability insurance through RLL, the tenants were instead
paying $10.00 in "extra rent" per month for an "Owner Damage Loss Waiver", to waive
the liability insurance requirements set forth in their rental lease agreement.  AMC further
claimed that the RLL policy indemnifies the PROPERTY OWNERS for damage to the
AMC managed residential rental properties and did not provide liability coverage to the
renter.

69. However, under the terms of the group master policy RLL provided, RLL did in fact have a liability insurance certificate in the name of each tenant where the individual tenants were the beneficiaries.

70. Furthermore, RLLRGP, as an entity organized under the LRRA, is required to insure individuals from liability for damages to another person due to damage to that person's property.

71. Upon information and belief, Defendant RLL was in fact providing a group master policy of renter's liability insurance to the tenants residing in AMC managed residential rental properties, but asked AMC and the PROPERTY OWNERS to market this policy as a waiver of coverage in order to evade the insurance statutes.

72. Utah Code §§ 31A-23a-402.5, 31A23a-504, and 76-6-521, along with similar state statutes in the other states in which this illegal scheme was going on, clearly prohibit RLL from providing payments or fees derived from schemes to the PROPERTY OWNERS for the insurance contracts it enters into with the tenants of the AMC managed residential rental properties.

73. The secret scheme whereby PROPERTY OWNERS purchase a group master policy from RLL and RLL in return pays a kickback of at least 42% of every premium to the PROPERTY OWNERS constitutes mail and wire fraud under the Racketeering Influenced and Corrupt Organizations Act.

74. Defendant RLL claims that its actions in providing kickbacks to the PROPERTY OWNERS are permissible because it is offering a Master Corporate Policy to the PROPERTY OWNERS covering property damage rather than a group master policy issued in the PROPERTY OWNERS name to the tenants providing the tenants with

14

renter's liability coverage.  However, upon information and belief, a review of the actual policies marketed and sold by RLL show that the policies purchased by the PROPERTY OWNERS and the certificates issued to tenants of AMC managed residential rental properties are indeed liability coverage, not property coverage policies.

## FIRST CAUSE OF ACTION

(Breach of Contract)

75. Plaintiffs re-allege and incorporate by reference each of the allegations set forth in Paragraphs 1 through 74 of this Complaint and further allege as follows:

76. Plaintiffs and each of the PROPERTY OWNERS had a valid and enforceable contract in the Marketing Agreements.

77. Under the terms of the Marketing Agreements, Plaintiff WWIG had a duty to implement a renter's insurance policy with automatic qualifying coverage and no underwriting or application process for each tenant residing in the PROPERTY OWNERS residential rental properties managed by AMC.

78. Under the terms of the Marketing Agreements, Defendant PROPERTY OWNERS were contractually obligated to permit Plaintiffs to perform under the terms of the Marketing Agreements and collect insurance premiums for WWIG through the Pay-With-Rent program set up by Defendant PROPERTY OWNERS.

79. Under the terms of the Marketing Agreements, PROPERTY OWNERS had agreed that the Marketing Agreement would not expire until after WWIG had provided services for one year and would automatically renew for succeeding one year terms unless notice is given that the contract will not be renewed.

80. For the sole purpose of receiving an illegal kickback, Defendant PROPERTY OWNERS unilaterally terminated the Marketing Agreement before the terms of the agreement expired and refused to continue collecting insurance premiums from the tenants with insurance contracts with WWIG through the pay-with-rent program.

81. Plaintiffs performed all of their material obligations under the terms of the Marketing Agreements until Plaintiffs were notified, through AMC, that Defendant PROPERTY OWNERS intended to breach the terms of the Marketing Agreement.

82. Each of the PROPERTY OWNERS breached the terms of the Marketing Agreement by prematurely terminating their relationship with Plaintiff and refusing to continue to collect tenant insurance premiums through the Pay-With-Rent program.

83. As a direct and foreseeable result of the PROPERTY OWNERS breach of the Marketing Agreements, Plaintiffs have suffered damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

(Breach of the Implied Duty of Good Faith and Fair Dealing)

84. Plaintiffs re-allege and incorporate by reference each of the allegations set forth in Paragraphs 1 through 83 of this Complaint and further allege as follows:

85. Plaintiffs and each of the PROPERTY OWNERS had a valid and enforceable contract in the Marketing Agreements.

86. Under the terms of the Marketing Agreements, Plaintiff WWIG had a duty to implement a renter's insurance policy with automatic qualifying coverage and no underwriting or application process for each tenant residing in the PROPERTY OWNERS residential rental properties managed by AMC.

16

87. Under the terms of the Marketing Agreements, Defendant PROPERTY OWNERS were contractually obligated to permit Plaintiffs to perform under the terms of the Marketing Agreements and collect insurance premiums for WWIG through the pay-with-rent program set up by Defendant PROPERTY OWNERS.

88. A covenant of good faith and fair dealing is inherent in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

89. Implied within each contract is the inferred promise that each party will not intentionally or purposely do anything which will destroy or injure the other party's rights to receive the fruits of the contract.

90. Defendant PROPERTY OWNERS breached the implied covenant of good faith and fair dealing by, among other things, conspiring with Defendants to push Plaintiffs' out of the AMC properties in order to receive an illegal kickback of $3.00 per month per tenant.

91. By conspiring with Defendant RLL to receive an illegal kickback, Defendant PROPERTY OWNERS failed to act consistently with the Marketing Agreements common purpose and the justified expectations of Plaintiff WWIG.

92. As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff WWIG has suffered damages.

93. Plaintiff WWIG seeks damages resulting from the Defendant PROPERTY OWNERS breach of their duties in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

(Breach of Fiduciary Duty)

94. Plaintiffs re-allege and incorporate by reference each of the allegations set forth in Paragraphs 1 through 93 of this Complaint and further allege as follows:

95. Defendant WISEMAN and Jeff White were co-owners of WWIG and WW-ARIS until WISEMAN sold his interest in these entities back to the respective entities on or about March 15, 2011.

96. Defendant WISEMAN served as a manager/member for WW-ARIS from its inception until March 2013.

97. As a manager/member of WW-ARIS, WISEMAN owed a fiduciary duty to WW-ARIS.

98. WISEMAN took improper advantage of his superior knowledge and position and failed to have undivided loyalty to WW-ARIS.

99. WISEMAN breached his fiduciary duty by knowingly engaging in, and encouraging other Defendants to among other things, breach their contracts with Plaintiffs and engage in an illegal insurance scheme which he knew or should have known would cause irreparable harm to WW-ARIS.  These breaches amounted breaches of the duty of loyalty, care and disclosure owed by a fiduciary.

100.      As a direct and proximate result of Defendant WISEMAN's breach of fiduciary duty, Plaintiff WW-ARIS have been injured and damaged in an amount to be proven at trial, and will sustain continuing irreparable damage and injury for which Plaintiffs have no adequate remedy.

101.      Defendant WISEMAN's actions and omissions were the result of conduct that manifested a reckless indifference toward, and a disregard of, Plaintiff WW-ARIS' rights, entitling Plaintiff WW-ARIS to an award of punitive damages for Defendant WISEMAN's breaches of fiduciary duty.

### FOURTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duty)

102.      Plaintiffs re-allege and incorporate by reference all of the allegations set forth in Paragraphs 1 through 101 of this Complaint and further allege as follows:

103.      Defendant WISEMAN and Jeff White were co-owners of WWIG and WW-ARIS until WISEMAN sold his interest in these entities to back to those entities on or about March 15, 2011.

104.      Defendant WISEMAN served as a manager/member of WW-ARIS from its inception until September 2013.

105.      As a manager/member of WW-ARIS, WISEMAN owed a fiduciary duty to WW-ARIS.

106.      WISEMAN took improper advantage of his superior knowledge and position and failed to have undivided loyalty to WW-ARIS.

107.      WISEMAN breached his fiduciary duty by knowingly engaging in, and encouraging other Defendants to engage in, an illegal insurance scheme which he knew or should have known would cause irreparable harm to WW-ARIS.

108.      Defendant RLL knew that Defendant WISEMAN, as a member manager and/or board member of WWIG and WW-ARIS, owed a fiduciary duty to Plaintiffs WWIG and WW-ARIS.

19

109.     Defendant RLL also knew that Defendant WISEMAN was in breach of his fiduciary duties to WWIG and WW-ARIS.

110.     Defendant RLL knowingly provided substantial assistance and encouragement to Defendant WISEMAN to breach his fiduciary duties to WWIG and WW-ARIS.

111.     Defendant RLL therefore aided and abetted Defendant WISEMAN's breach of fiduciary duties.

112.     As a result of Defendant RLL's bad acts, Defendant RLL is jointly responsible with Defendant WISEMAN for the damages to WWIG and WW-ARIS resulting from those breaches in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

(Wrongful Interference with Existing Contractual Relations

in the TENANT INSURANCE CONTRACT)

113.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth in Paragraphs 1 through 112 of this Complaint and further allege as follows:

114.     Defendants knew that Plaintiffs were selling renter's insurance to tenants residing in AMC managed residential rental properties owned by the PROPERTY OWNERS.

115.     The 29,601 renter's insurance policies entered into between Plaintiffs and the tenants residing in residential rental properties owned by PROPERTY OWNERS and managed by AMC constituted valid contracts between the Plaintiffs and the tenants.

116.     In order to receive a $3.00 per tenant per month illegal kickback, Defendants wrongly, improperly, and intentionally interfered with Plaintiffs' existing

economic relations between the tenants whom Plaintiffs sold renter's liability insurance to by, among other things, refusing to continue to collect insurance premiums on behalf of the tenants as agreed to and by representing to the tenants in AMC managed residential rental properties that the renter's insurance offered by Defendant RLL was equivalent to the rental liability insurance offered by WWIG.

117.     None of the Defendants are parties to the tenant renter's liability insurance policies, nor are they third-party beneficiaries of the renter's liability insurance policies issued by WWIG to the tenants residing in residential rental properties managed by AMC.  Further, none of the Defendants have any beneficial or economic interest in the tenant renter's liability insurance policies.

118.     The Defendants acted in bad faith and with the intent to maximize their own profits, intentionally and unjustifiably created an illegal scheme which violated state insurance laws and interfered with the Plaintiffs' and the tenants' rights under the contracts, as described above, by, inter alia, entering into an exclusive relationship with RLL, whereby RLL provided kickbacks to PROPERTY OWNERS in exchange for the exclusive right to provide insurance policies to tenants of AMC residential rental properties owned by PROPERTY OWNERS and refusing to continue the Pay-With-Rent program essential to the contractual relationship between Plaintiffs and the tenants with rental liability insurance through WWIG.

119.     Through PROPERTY OWNERS intentional interference, nearly all of the tenants WWIG had insurance with preferred to pay their insurance premiums through a pay-with-rent program and transferred their policies from WWIG to policies held by Defendant RLL.

21

120.     As a direct and proximate result of the Defendants intentional interference with Plaintiffs' existing and prospective economic relations, Plaintiffs have been injured and damaged in an amount to be proven at trial, and will sustain continuing irreparable damage and injury for which Plaintiffs have no adequate remedy at law.

121.     Defendants' intentional actions, as described herein, constitute willful and malicious conduct with an evidence disregard of, and a knowing and reckless indifference for, the rights of the Plaintiffs, which constitute grounds for punitive damages in an amount to be proven at trial, but in no event less than three times actual damages.  Plaintiffs are entitled to injunctive relief prohibiting Defendants from further interference with Plaintiff's existing or prospective tenant rental insurance customers.

## SIXTH CAUSE OF ACTION

(Wrongful Interference with Existing Contractual Relations – MARKETING CONTRACT)

122.     Plaintiffs re-allege and incorporate by reference all of the allegations set forth in Paragraphs 1 through 121 of this Complaint and further allege as follows:

123.     Plaintiffs and each of the PROPERTY OWNERS had a valid and enforceable contract in the Marketing Agreements.

124.     Defendants WISEMAN, AMC, RLL, and POE CORPORATIONS knew or should have known that Plaintiffs had contracts, in the form of Marketing Agreements, with each of the Defendant PROPERTY OWNERS permitting Plaintiffs to offer renter's insurance to tenants residing in residential rental properties owned by Defendant PROPERTY OWNERS with a Pay-With-Rent option for payment of the monthly premiums.

125.    Defendants WISEMAN, AMC, RLL, and POE CORPORATIONS wrongfully, improperly, and intentionally interfered with Plaintiffs' existing economic relations by, among other things, devising an illegal scheme for selling insurance and convincing Defendant PROPERTY OWNERS to abandon the Marketing Agreements they had entered into with Plaintiffs and deprive Plaintiffs of the opportunity to use the Pay-With-Rent program in place with each of the tenants in order to benefit from the illegal insurance scheme.

126.    As a direct and proximate result of Defendant WISEMAN, AMC, RLL, and POE CORPORATIONS' intentional interference with Plaintiffs' existing and prospective economic relations, Plaintiffs have been injured and damaged in an amount to be proven at trial, and will sustain continuing irreparable damage and injury for which Plaintiff has no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

(Intentional Interference with Prospective Economic Relations)

127.    Plaintiffs re-allege and incorporate by reference all of the allegations set forth in Paragraphs 1 through 126 of this Complaint and further allege as follow:

128.    Defendants knew that Plaintiffs were selling residential rental insurance to tenants residing in residential rental properties managed by AMC.

129.    Defendants knew or should have known that Plaintiffs were limited, by the Utah Department of Insurance, to only sell renter's insurance to tenants residing in in residential rental properties managed by AMC.

130.    Defendants wrongfully, improperly, and intentionally interfered with Plaintiffs' prospective economic relations by unilaterally breaching and/or encouraging

other Defendants to breach their contracts with the Plaintiffs', by discontinuing the collection of insurance premiums for WWIG, and by wrongfully representing to the tenant residents of AMC managed residential rental properties that the RLL policies were equivalent insurance when in fact the insurance offered by RLL was an inferior product for which tenants were over paying in order for RLL to illegally provide a kickback to Defendants PROPERTY OWNERS.

131.     As a direct and proximate result of Defendants' intentional interference with Plaintiffs' prospective economic relations, Plaintiffs have been injured and damaged in an amount to be proven at trial, and will sustain continuing irreparable damage and injury for which Plaintiffs have no adequate remedy at law.

## EIGHTH CAUSE OF ACTION

(Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))

132.     Plaintiffs re-allege and incorporate by reference all of the allegations set forth in Paragraphs 1 through 131 of this Complaint and further allege as follows:

133.     At all relevant times, Defendants were associated with an illegal enterprise by selling a $7.00 insurance policy for $10.00, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

134.     The RICO enterprise which engaged in and the activities of which affected interstate commerce, was comprised of an association in fact of entities and individuals

that included Defendants AMC, PROPERTY OWNERS, RLL, and POE CORPORATIONS.

135.　　The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by preventing Plaintiffs from selling renters insurance to tenants residing in AMC managed residential rental properties owned by the PROPERTY OWNERS so that RLL could illegally inflate the premiums it was charging to the tenants purchasing rental insurance policies from RLL.  Defendants shared the bounty of their enterprise, i.e., by sharing the premiums and kickbacks generated by the joint scheme.

136.　　The RICO enterprise functioned over a period of years as a continuing unit and has a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

137.　　Defendants AMC, RLL, POE CORPORATIONS, and the PROPERTY OWNERS, conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous violations of federal mail and wire fraud states, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. § 1341 and 1343.

138.　　As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and representations to Plaintiffs and the AMC tenants with the intent to fraud and deceive Plaintiffs and the AMC tenants.  For example, Defendants AMC and PROPERTY OWNERS represented to Plaintiffs that the Marketing Agreements and the Pay-With-Rent program was being terminated with Plaintiffs because Defendant RLL was offering a more competitively priced product when in

reality, RLL was offering illegal kickbacks of $3.00 per tenant per month to PROPERTY

OWNERS.  Additionally, Defendant AMC with the approval of Defendants RLL and the

PROPERTY OWNERS, sent form letters to the tenants stating first that RLL was

offering an equivalent renters insurance policy to the policy offered by WWIG (it was

not) and then Defendants altered their position after acknowledging  the illegality of the

arrangement between the Defendants and instead sending letters to the tenants indicating

that they were not purchasing liability insurance but were instead purchasing a "waiver"

of insurance, despite the master insurance policy Defendant RLL had already in place.

139.     These Defendants represented to the tenants that the premiums they would

be paying represented the cost of the insurance (or later the cost of the waiver) but in

making these statements, Defendants knowingly and intentionally fostered the mistaken

impression that the rental insurance premiums paid by the tenants represented the cost of

the policies when in fact such premiums cost more because they were inflated to include

kickbacks to the PROPERTY OWNERS.  Defendants had a duty to correct this mistaken

impression.  The omission was material, as it gave Defendants a colorable reason to

charge the AMC tenants excessive charges for the coverage they received and would

have influenced the tenants decision whether to end their relationship with Plaintiffs or

continue with WWIG insurance.

140.     For the purpose of executing the scheme to defraud, Defendants sent,

mailed, and transmitted, or caused to be sent, mailed or transmitted, in interstate or

foreign commerce numerous materials, including but not limited to the notices and letters

described above.  Defendants also transferred sums among themselves, including but not

limited to various form of kickbacks, in furtherance of their scheme to defraud Plaintiffs and the AMC tenants, in violation of the wire fraud statutes.

141.     By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damage to Plaintiffs and the AMC tenants in the form of lost profits to Plaintiffs and excess charges to the AMC tenants.

142.     Plaintiffs seek compensatory and treble damages and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## NINTH CAUSE OF ACTION

(Civil Conspiracy)

143.     Plaintiffs re-allege and incorporate by reference all of the allegations set forth in Paragraphs 1 through 142 of this Complaint and further allege as follows:

144.     Defendants WISEMAN, AMC, PROPERTY OWNERS, POE CORPORATIONS, and RLL conspired together to interfere with the contracts of the Plaintiffs in order deprive the Plaintiffs of the benefits of those contracts and so that Defendant PROPERTY OWNERS could receive an illegal kickback.  In so doing, Defendants agreed to and in fact made fraudulent and/or negligent misrepresentations to Plaintiffs as well as others.

145.     WISEMAN, AMC, PROPERTY OWNERS, POE CORPORATIONS, and RLL have committed one or more overt, unlawful acts of fraud, as further described and alleged herein.

146.     As a direct and proximate result of WISEMAN, AMC, PROPERTY OWNERS, POE CORPORATIONS, and RLL's conspiracy, the Plaintiffs have been damaged in an amount to be proven at trial in this matter.

147.     Each of the conspirators is jointly and severally liable for all of the losses incurred by Plaintiffs.

148.     The actions of the Defendants were willful, fraudulent, and malicious and the Plaintiffs are entitled to an award of punitive and exemplary damages, the exact amount to be proven at trial.

Plaintiffs demand a trial by jury for all such triable claims.

## **PRAYER**

WHEREFORE, Plaintiffs ask that the Court enter judgment in favor of Plaintiffs and against Defendants as follows:

1. For damages for breach of contract in an amount to be decided at trial;

2. Awarding damages sustained by Plaintiffs as a result of the breaches of contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

3. Awarding Plaintiffs the costs and disbursements and reasonable allowances for the fees of Plaintiff's counsel and experts, and reimbursement of expenses;

4. Awarding damages sustained by Plaintiffs as the result of the tortious interference;

5. Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

6. Such other and further relief as the Court may deem just and proper.

Dated: November 18, 2016

/s/ Marcia Fuller Durkin
Counsel for J. White, L.C., WWIG LLC,
WW-ARIS LLC
Utah State Bar #9973
Marcia.durkin@gmail.com